UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

In re:

THE GREAT ATLANTIC & PACIFIC TEA
COMPANY, INC., *et al.*,

            Reorganized Debtors.

FOOD EMPLOYERS LABOR RELATIONS
ASSOCIATION AND UNITED FOOD AND
COMMERCIAL WORKERS PENSION FUND,

            Appellants,

v.

THE GREAT ATLANTIC & PACIFIC TEA
COMPANY, INC., et al.,

            Appellees.
------------------------------------------------------------x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 3·31·2013

**OPINION AND ORDER**

12 Civ. 2809 (ER)

Ramos, D.J.:

The Food Employers Labor Relations Association and United Food and Commercial Workers Pension Fund ("FELRA") appeal from the *Findings of Fact, Conclusions of Law, and Order Confirming the Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code* (the "Confirmation Order"), entered on February 28, 2012 by United States Bankruptcy Judge Robert D. Drain (Bankr. Doc. 3477[1]), which confirmed the reorganized debtors' ("Reorganized Debtors" or "A&P") *First Amended Joint Plan of Reorganization* (the "Plan"). Doc. 1. Pending before the Court is the Reorganized Debtors'

---

[1] References to "Bankr. Doc." refer to documents filed in the underlying bankruptcy proceeding, In re: The Great Atlantic & Pacific Tea Company, Inc., *et al.*, No. 10-24549 (RDD). References to "Doc." refer to documents filed in the instant appeal.

motion to dismiss FELRA's appeal. Doc. 6. For the reasons set forth below, the appeal is DISMISSED as equitably moot.

## I.     Background

As relevant to the instant motion, the well-known supermarket chain A&P and its affiliates commenced the underlying bankruptcy proceedings on December 12, 2010, by filing voluntary petitions for relief pursuant to chapter 11 of the Bankruptcy Code. Bankr. Doc. 1.

### Negotiations between A&P and FELRA and the Side Letter Agreement

At the time A&P filed for bankruptcy, its subsidiary, Super Fresh Markets, Inc. ("Super Fresh"), operated approximately 25 stores in the Mid-Atlantic region. Bankr. Doc. 3332, Notice of Debtors' Motion for Authority to Enter into a Side Letter Agreement ¶ 8. A&P and United Food and Commercial Workers Local 27 ("Local 27) were parties to a Collective Bargaining Agreement ("CBA") which covered approximately 1,300 employees in the Super Fresh stores. *Id*. Pursuant to the terms of the CBA, Super Fresh was obligated to make contributions to a pension fund (the "Pension Fund") for covered employees. Bankr. Doc. 3240, Declaration of George Murphy, Jr. ¶ 5. As part of its reorganization, A&P sold or closed all but three of the Super Fresh stores. By order dated June 1, 2011, the bankruptcy court authorized the sale of the Super Fresh stores in accordance with certain "Store Rationalization Procedures" it had previously approved. Bankr. Doc. 1734. The sale of the assets of the Super Fresh stores generated more than $40 million in cash proceeds (excluding additional proceeds for inventory) and freed A&P from the costs of operating "underperforming stores" that were not part of their going-forward business plan. Bankr. Doc. 3041, Revised Disclosure Statement p. 40.

As a result of the sales, the number of employees covered by the CBA was reduced to approximately 100, or by approximately 91%. Given the size of the reduction of covered

employees, A&P thus concluded that a "partial withdrawal" from the pension fund covered by the CBA was triggered and subjected it to ERISA liability.[2] The partial withdrawal arguably gave FERLA a "claim" subject to the Bankruptcy Code's discharge provisions. 11. U.S.C. § 101(5). FERLA thereafter filed contingent proofs of claim for withdrawal liability in the estimated amount of $76,846,817, which reflected "the amounts that might be owed in the event of a future withdrawal" and "clearly stated that its claims were contingent." Bankr. Doc. 3240, FERLA's Objection to the Debtors Joint Plan of Reorganization ¶¶ 16-17.

In order to eliminate any doubt as to how FERLA's claim would be treated in the Plan, on January 9, 2012, A&P proposed to enter into a side letter agreement (the "Side Letter Agreement") with Local 27 explicitly eliminating A&P's obligation to contribute to the Pension Fund for the remaining employees permanently and completely. *Id*. Ex. 2, Dec. of George Murphy, Jr. ¶ 11. FELRA initially refused to enter into the agreement and, in its filing entered on January 24, 2012, specifically contested that A&P had even partially withdrawn from the pension fund. *Id*. Ex. 1, Dec. of William R. Jensen ¶ 4. In their objections to the proposed Joint Plan of Reorganization, FELRA argued:

> Super Fresh does not satisfy either of these standards for [complete] withdrawal, but the Debtors have nonetheless elected to classify the Pension Fund's claims as "Class J Pension *Withdrawal Claims"* –treating the Pension Fund's contingent claims as liquidated, prepetition unsecured claims, and improperly including the Pension Fund's claims with other pension plans from which the Debtors withdrew prepetition.

Id. ¶ 3 (emphasis in original).

On January 31, A&P sent the president of Local 27 a letter which provided:

---

[2] Under the Employee Retirement Income Security Act ("ERISA"), a "partial withdrawal" from multiemployer plans covering retail food employees, like the Super Fresh employees here, occurs when the employer reduces its "contribution base units" by 35% during a three-year testing period, which consists of the plan year and two immediately preceding plan years. 29 U.S.C. § 1385(c). "Complete withdrawal" from a multiemployer plan occurs when an employer permanently ceases to have an obligation to contribute to the plan or permanently ceases the operations for which it had an obligation to contribute to the plan. 29 U.S.C. § 1383.

3

> As we discussed over the past few months, [A&P] will immediately effectuate a complete withdrawal from the FELRA Pension Fund prior to the confirmation of its plan of reorganization. This can be accomplished either by (i) Local 27's agreement that [A&P]'s obligation to contribute to the FELRA fund for all employees ceases immediately and permanently, with all affected employees being transferred to another retirement plan, such as the UFCW International Pension Plan, for future benefits or (ii) [A&P] closing the affected stores employing Local 27 members who participate in FELRA, effective as of February 1, 2012.

Bankr. Doc. 3346, FELRA's Objection to Debtors' Motion for Authority to Enter into a Side Letter Agreement, Ex. A. "Faced with the possibility of the employees at the remaining stores losing their jobs," Doc. 18 p. 6, Local 27 relented and entered into the Side Letter Agreement. The Side Letter Agreement, dated January 31, 2012 between FELRA and A&P provides in relevant part:

> As a result of the sale or closure of stores by [A&P] during its bankruptcy proceedings ("Store Sales"), [A&P] has significantly reduced its contributions to the FELRA Fund under the CBA.
>
> In consideration of mutual promises and covenants made herein and for other good and valuable consideration, the parties agree as follows:
>
> 1. The Parties acknowledge and agree that as of January 31, 2012: (a) [A&P's] obligations under the CBA to contribute to the FELRA Fund with respect to all employees will cease immediately and permanently and A&P will withdraw from the FELRA Fund in a complete withdrawal, and (b) the CBA shall be deemed modified, as necessary to reflect such cessation and withdrawal, effective immediately and permanently.

Bankr. Doc. 3332.

The effect of the Side Letter Agreement was, of course, that FELRA's claim would be discharged upon the confirmation of the Plan as a complete withdrawal.[3] That was precisely the

---

[3] Section 1141(d)(1) of the Bankruptcy Code provides in relevant part, "Except as otherwise provided in this subsection . . . the confirmation of a plan . . . discharges the debtor from any debt that arose before the date of such confirmation . . . whether or not a proof of claim based on such debt is filed[.]" 11 U.S.C. § 1141(d)(1).

4

"certainty" that A&P had sought. See Bankr. Doc. 3354, Debtors' Memorandum of Law in Support of Confirmation of the Joint Plan ¶ 139 ("During Debtors' negotiations with Local 27 . . . the Debtors made clear that a complete and permanent cessation of their obligations to contribute to FELRA was *absolutely essential* to the Debtors' emergence from chapter 11 protection.") (emphasis added). After executing the Side Letter Agreement, however, FELRA had a change of heart and challenged the transaction as one whose principal purpose was to evade or avoid withdrawal liability within the meaning of Section 4212(c)[4] of [ERISA]." Bankr. Doc. 3346 ¶ 4. Accordingly, FELRA objected to A&P's request for authorization to enter into the Side Letter Agreement and requested that the matter be resolved through arbitration. *Id.* FELRA also objected on the alternate ground that its claims were not properly classified as Pension Withdrawal Claims.[5] *Id.* ¶ 22.

At the confirmation hearing on February 6, 2012, FELRA sought to have itself removed from the Plan's Class J, Pension Withdrawal Claims. Doc. 18. p. 7. Over FELRA's objection, Judge Drain authorized the Side Letter Agreement in an order dated February 8, 2011. Bankr. Doc. 3391.

The confirmation hearing was continued on February 27, 2012. At that time, FELRA orally moved for a stay pending its appeal of the Bankruptcy Court's decision overruling its objections to the Plan. Judge Drain denied the request for a stay. The judge noted:

---

[4] Section 4212 of ERISA, codified at 29 U.S.C. § 1392, defines an employer's obligation to contribute under a collective bargaining agreement, provides that payments of withdrawal liability are not considered contributions, and requires that this part be applied to any transaction whose "principal purpose" is to evade or avoid liability under this part. 29 U.S.C. 1392 (a)-(c).

[5] The Plan defines Class J, Pension Withdrawal Claims "any and all claims against the Debtors arising from the Debtors' complete or partial withdrawal from any Multiemployer Pension Plans related to actions or events occurring prior to the Effective Date, including . . . Food Employers Labor Relations Association and United Food and Commercial Workers Pension Fund." Bankr. Doc. 3477-1 at 11.

> [I]t seems to me that while I obviously have to weigh the issue of your objection becoming moot, it's not clear to me necessarily that it would become moot, and, more importantly, the harm to the debtors of delaying confirmation pending a determination on a seventy-three-million-dollar claim far outweighs the risk that FELRA faces.
>
> Clearly to me, this was a claim that falls within the case law of Chateaugay and the other cases that is a pre-petition claim, except for, possibly, for the tiny sliver earned post-petition. *And leaving that issue open is going to cause irreparable harm to the debtors because they won't be able to close.* So on the merits, obviously I would not deny a request for a stay because I ruled against you -- that's not the standard -- I do believe that as far as the nature of the claim is concerned, pre or post-petition or dischargeable or not, that is a clear loser on your part, and I would stand on that.

Bankr. Doc. 3505, Transcript of February 27, 2012 confirmation hearing, 78:7-22 (emphasis added).

Notwithstanding his preliminary ruling, Judge Drain invited FELRA to make a further written submission on their request for a stay: "You could persuade me in writing otherwise. Or, alternatively, my preliminary ruling could be my final ruling and *you can go right away to the district court if you want and ask for a stay.*" *Id*. 79:14-17 (emphasis added). FELRA opted for the latter option, and requested that the Judge issue a final oral ruling. The judge found:

> All right. Well, what I just gave you will be my final ruling on this issue. I find that, given the balance of the harms here and my analysis of the -- as well as my analysis of the merits, but primarily based on the balance of the harms, that a stay is not warranted, particularly as here, where there's no offer of any bond to protect the debtors in the event that the proposed transaction or the financing -- the exit financing -- go by the boards as a result of the stay.

*Id*. 81:15-22.

FELRA did not seek an appeal of Judge Drain's denial of their request for a stay in this Court. Judge Drain signed the Confirmation Order that very day, Feburary 27, 2012, and it was entered on February 28, 2012. The Plan became effective on March 13, 2012 (the "Effective

6

Date"). The Notice of Appeal was filed approximately one month later, on April 10, 2012. Doc. 1.

**The Confirmation of the Plan of Reorganization**

The negotiations concerning the CBA with FELRA were, of course, but one piece of a much larger, complex plan of reorganization. Frederic F. Brace, a consultant for A&P and, prior to its emergence from chapter 11 protection, its Chief Financial Officer, Chief Administrative Officer and Chief Restructuring Officer, submitted a declaration in support of the instant motion describing, among other things, the "cascade of transactions and other events" that occurred immediately after the Effective Date the Plan on March 13, 2012. Doc. 7 ("Brace Dec."). On the Effective Date, the Reorganized Debtors emerged from chapter 11 protection and began conducting business as a reorganized company. Specifically, over the course of the following month Mr. Brace noted that A&P engaged in the following transactions:

- discharged nearly a billion dollars in debt held by over 7,000 creditors and permanently enjoined those creditors from asserting those claims against A&P;

- cancelled approximately 53.8 million shares of publicly traded common stock in The Great Atlantic & Pacific Tea Company, Inc. held by more than 16,000 shareholders;

- issued approximately 800,000 shares of new common stock;

- issued over $455 million in second and third lien notes;

- issued warrants to Yucaipa Companies LLC (an investor) to allow it to purchase new common stock and new third lien convertible notes;

- received over $490 million from the convertible noteholders and Yucaipa for their new money investment and an additional $5 million from one of A&P's suppliers;

- closed on a $645 million exit financing facility;

- disbursed over $310 million in cash to second lien noteholders through the Depository Trust Company ("DTC"), making it difficult if not impossible to now claw back the distributions;

- disbursed more than $55 million in payments on account of cure payments, 503(b)(9) claims, and other administrative claims to approximately 250 separate vendors, landlords, service providers, contract counterparties, and others;

- filed amended certificates of incorporation for all A&P corporate entities and amended the operating agreements for each LLC subsidiary;

- formed new holding companies for real estate and pharmaceutical assets;

- filed a Form 15 with the Securities Exchange Commission to deregister its old common stock; and

- named a new slate of seven directors as required by the Plan, who have begun to make critical decisions for the Reorganized Debtors.

Id. ¶ 5.

A&P argues that, as a practical matter, granting FELRA the relief it requests would require unwinding the entire Plan which would likely be impossible given the countless other transactions have been entered into in reliance on the Plan. Specifically, to unwind the Plan, A&P would have to return the $490 million in new investment received from its investors and reclaim the 800,000 shares of new stock and over $455 million in second and third lien notes that have been issued. *Id.* ¶ 6.

A&P has now paid hundreds of millions of dollars in distributions. In particular, over $310 million was distributed to over 200 holders of the Reorganized Debtors' prepetition second lien notes through DTC, which then made distributions to the participants who certified an interest in the securities with their DTC counterpart. *Id.* ¶ 7. The participants then further distributed or credited the underlying book entry account of the second lien noteholders. *Id.* A&P does not have a record of the second lien noteholders or their holdings—making reversal of the distributions to such holders a daunting, if not impossible, task. *Id.* Unwinding the Plan

8

would further require the reinstatement of the old A&P common stock outstanding prior to the Effective Date, which was delisted during the course of the chapter 11 cases and cancelled upon the Plan becoming effective. *Id.*

In light of the foregoing, Brace concluded that unwinding the Plan would be "impractical, [] likely impossible, and would certainly be inequitable." *Id.* Moreover, Brace opines that if the Confirmation Order were overturned, A&P would be forced to liquidate, forcing thousands out of work and leaving FELRA in, at best, the same position it is in now. *Id.* ¶ 8.

For its part, FELRA does not dispute that the significant and consequential economic activity detailed in the Brace declaration has taken place—or indeed that the Plan is substantially consummated—and concedes that "the drastic undertaking of unwinding the entire Plan and forcing liquidation . . . would not achieve the Pension Fund's objectives at all." Doc. 18 p. 11. Rather, FELRA argues that the relief it requests does not require unwinding the entire Plan at all, and that it only seeks the removal of itself as a creditor under Plan on the basis that the Debtors have not withdrawn from the Pension Fund. *Id.*[6]

## II.   Discussion

### A.  Standard of Review

This Court has jurisdiction to hear appeals from decisions of a bankruptcy court pursuant to 28 U.S.C. § 158(a), which provides in relevant part that "[t]he district courts of the United States shall have jurisdiction to hear appeals . . . from final judgments, orders, and decrees; . . . [and,] with leave of court, from other interlocutory orders and decrees . . . of bankruptcy judges." 28 U.S.C. § 158(a).  A district court reviews a bankruptcy court's findings of fact for clear error

---

[6] The Court notes that FELRA has not met Brace's Declaration concerning the likely effects of granting the relief it seeks with a declaration or other factual submission of its own, aside from the arguments in its memorandum in opposition.

9

and its conclusions of law *de novo*.  *Overbaugh v. Household Bank, N.A. (In re Overbaugh),* 559 F.3d 125, 129 (2d Cir. 2009); see Fed. R. Bankr. P. 8013 (a district court may "affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree," and "[f]indings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous").

### B. FELRA's Appeal is Equitably Moot

Equitable mootness is a prudential doctrine that is invoked to avoid disturbing a reorganization plan once implemented.  *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 144 (2d. Cir. 2005); *see also MAC Panel Co. v. Va. Panel Corp.*, 283 F.3d 622, 625 (4th Cir.2002) ("[E]quitable mootness is a pragmatic principle, grounded in the notion that, with the passage of time after a judgment in equity and implementation of that judgment, effective relief on appeal becomes impractical, imprudent, and therefore inequitable." (emphasis omitted)).  An appeal should also be dismissed as moot when, even though effective relief could conceivably be fashioned, implementation of that relief would be inequitable.  *In Re Chateaugay Corp.*, 988 F.2d 322, 325 (2d Cir. 1993) ("*Chateaugay I*") (citing In re AOV Industries, Inc., 792 F.2d 1140, 1147 (D.C.Cir.1986)).  Such a dismissal is appropriate when, for example, the appellant has made no effort to obtain a stay and has permitted such a comprehensive change of circumstances to occur as to render it inequitable for the appellate court to reach the merits of the appeal.  *Id.* (internal quotation omitted) (citing *In re Crystal Oil Co*., 854 F.2d 79, 82 (5th Cir.1988).

As an initial matter, the Court finds that the Plan is "substantially consummated."  Under the Bankruptcy Code, a plan is "substantially consummated" upon (1) transfer of substantially all of the property proposed by the plan to be transferred; (2) the reorganized debtor's assumption of the debtor's business; and (3) commencement of distribution under the plan.  11 U.S.C. § 1101(2).  Here, A&P has pointed to the number, size, and complexity of the transactions it has

completed since the Plan's March 13, 2012 Effective Date, including: the issuance of 800,000 shares of new stock; the discharge of nearly a billion dollars in debt to over 7,000 creditors; the closing on a $645 million exit financing facility; and the disbursement of $310 million in cash to second lien holders. Accordingly, A&P's Plan has been "substantially consummated" as that term is defined by the Code, and FELRA has not argued otherwise on appeal. *In re Metromedia Fiber Network, Inc.*, 416 F.3d at 144.

When a reorganization has been substantially consummated, there is a "strong presumption" that an appeal of an unstayed order is moot. *Freeman v. Journal Register Co.*, No. 09-CIV-7296 (JGK), 2010 WL 768942, at *4 (quoting *Allstate Ins. Co. v. Hughes*, 174 B.R. 884, 889 (S.D.N.Y.1994)); *see also In re Metromedia Fiber Network, Inc.*, 416 F.3d at 144. This presumption may only be overcome when five circumstances are present:

> (a) the court can still order some effective relief; (b) such relief will not affect the re-emergence of the debtor as a revitalized corporate entity; (c) such relief will not unravel intricate transactions so as to knock the props out from under the authorization for every transaction that has taken place and create an unmanageable, uncontrollable situation for the Bankruptcy Court; (d) the parties who would be adversely affected by the modification have notice of the appeal and an opportunity to participate in the proceedings; and (e) the appellant pursued with diligence all available remedies to obtain a stay of execution of the objectionable order ... if the failure to do so creates a situation rendering it inequitable to reverse the orders appealed from.

*Frito–Lay, Inc. v. LTV Steel Co. (In re Chateaugay, Corp.)*, 10 F.3d 944, 952–53 (2d Cir.1993) ("*Chateaugay II*") (internal citations, quotations, and alterations omitted).

The parties agree that a resolution of the motion requires an analysis of the *Chateaugay II* factors. Even a cursory review of those factors, however, make clear that FELRA is not able overcome the presumption that a substantially consummate plan should not be disturbed.

11

### i. The Court is Unable to Order Some Effective Relief

While substantial consummation of a reorganization plan is a "momentous event," the Second Circuit has cautioned that it does not necessarily make it impossible or inequitable for an appellate court to grant effective relief. *Chateaugay II,* 10 F.3d at 952. Thus, failure to provide effective relief has been found where the transactions already consummated cannot be undone, assets sales have been completed, and funds have been disbursed to persons who are not parties to the appeal. *See e.g. Bartel v. Bar Harbor Airways, Inc.*, 196 B.R. 268, 272 (S.D.N.Y. 1996) (finding inability to provide effective relief where the asset sales are completed and the proceeds already distributed); *In re Blumer*, 66 B.R. 109, 113 (B.A.P. 9th Cir. 1986), *aff'd*, 826 F.2d 1069 (finding it impossible to grant effective relief where funds have been disbursed to non-litigants).

Here, FELRA's conclusory assertion that the relief it requests would not require the unwinding of the entire Plan is unpersuasive, and insufficient to rebut the finding of the Bankruptcy Court that "[e]ach term and provision of the Plan . . . is integral to the Plan." Confirmation Order ¶ 182. *See also* Confirmation Order ¶ 214 ("*For the avoidance of doubt*, the Debtors are assuming the Modified Collective Bargaining Agreement between the Debtors and United Food and Commercial Workers International Union Local 27 . . . as further modified by the Side Letter of Agreement, dated January 31, 2012, between the Debtors and Local 27.") (emphasis added). A&P has submitted sufficient evidence for the Court to conclude that excising FELRA's $76 million dollar claim, and reclassifying it, would have a deleterious effect on the numerous transactions that necessarily had to be consummated for the Plan to become effective. FELRA has offered no facts in response. *See In re Metromedia Fiber Network, Inc.*, 416 F.3d at 145 (denying appeal as equitably moot after finding that the inter-relatedness of the

transactions would be affected by the relief sought: "It appears that all these things have been done, and that none can be undone without violence to the overall arrangements.")

### ii. The Relief Requested Will Affect the Re-emergence of A&P as a Revitalized Corporate Entity

A&P asserts that reclassifying FELRA's claim would constitute a default under the financing and investment agreements that underlie the Plan. FELRA's response is that such an occurrence is "unsupported speculation about the future." Doc. 18 p. 12. The Court notes that it is not speculation to conclude that A&P's counterparties would move appropriately to assert their rights under the agreements in the event that a $76 million claim were found to not to be dischargeable in Bankruptcy. As the Judge Drain noted at the February 6, 2012 hearing: "I can't imagine any investor agreeing to close on a deal where they wouldn't know whether a seventy-three million dollar claim was going to be discharged or not. I mean, it's just a joke. They would never do that." Transcript of February 6, 2012 Hearing, 111:2-6.

The same irrefutable logic applies after substantial consummation of the Plan. If reclassification results in an event of default, it would be unreasonable assume that the investors would not exercise their foreclosure rights in the face of a liability that could imperil the entire Plan and their substantial investment. Such an event would clearly affect the ability of A&P to emerge as a revitalized entity. In any event, even if the Court cannot predict what will happen if this settlement is in any part altered, "having sought no stay of the bankruptcy court's order (and no expedited appeal), appellants bear the burden of this uncertainty." *In re Metromedia Fiber Network, Inc.*, 416 F.3d 145 (citing *Chateaugay I*, 988 F.2d at 326 ("The party who appeals without seeking to avail himself of that protection does so at his own risk.")).

### iii. Such Relief Will Likely Unravel The Plan

The Plan includes a severability provision that provides in relevant part that "[t]he Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan . . . is . . . nonseverable and mutually dependent." Doc. 1 Ex. 1, Art. XI.N. Clearly, the classification of FELRA's claim, as well as the Modified Collective Bargaining Agreement with Local 27, as further modified by the Side Letter Agreement, *see* Confirmation Order ¶ 214, are valid and integral to the Plan. *Id.* ¶ 182. Thus, pursuant to the terms of the Plan, if FELRA were to prevail on its appeal of the Confirmation Order, the entire Plan, having already been substantially consummated, would be doubt. *See Bartel v. Bar Harbor Airways, Inc.*, 196 B.R. 268, 272 (S.D.N.Y. 1996) (finding that where the asset sales are completed and the proceeds already distributed, the relief requested would "unravel intricate transactions" and "create an unmanageable, uncontrollable situation for the Bankruptcy Court."); *see also In re Continental Airlines*, 91 F.3d 553, 565 ("Where, as here, investors and other third parties consummated a massive reorganization in reliance on an unstayed confirmation order that, explicitly and as a condition of feasibility, denied the claim for which appellate review is sought, the allowance of such appellate review would likely undermine public confidence in the finality of bankruptcy confirmation orders and make successful completion of large reorganizations like this more difficult.")

### iv. All Parties Who Would be Adversely Affected Have Not Received Notice of the Appeal

FELRA has conceded that the only parties who have "received" notice of the appeal are those that were present at the February 27, 2012 hearing, or who received notice pursuant to Bankruptcy Rule 8001(a). Doc. 18 p. 15. FELRA's view as to the sufficiency of its effort—if it can be described as such—is based on the premise that its requested relief only focuses on a

"narrow aspect of the Plan." *Id.* As discussed above, FELRA's position is rebutted by the plain terms of the Plan and by the significance of its claim. This Court cannot find as a matter of fact or law that reclassification of FELRA's $76 million dollar claim, and the attendant rejection of the Confirmation Order, would not affect the dozens of innocent third parties that have already consummated transactions in reliance on the Plan. Accordingly, FELRA, admittedly, has failed to provide proper notice to all those who would be adversely affected by the Plan.

### v. FELRA has not Pursued with Diligence All Available Remedies to Obtain a Stay of Execution of the Order

FELRA asserts that the fact that it made an oral request of the Bankruptcy Court to issue a stay, which was promptly denied, satisfies its obligation under the fifth *Chateaugay II* factor. Doc. 18 p. 16. FELRA is mistaken. Courts in this Circuit do not merely require appellants in bankruptcy proceedings to request a stay in a perfunctory manner; they require *diligence*. In the instant case, while FELRA rightly notes that it did not request an oral ruling from Judge Drain so that it could request a stay from this Court, *id.,* it is the case that Judge Drain reasonably *assumed* that to be the case: "You could persuade me in writing otherwise. Or, alternatively, my preliminary ruling could be my final ruling *and then you can go right away to the district court if you want and ask for a stay*." Bankr. Doc. 3505, Transcript of February 27, 2012 confirmation hearing, 79:14-17. FELRA did not thereafter seek a stay of the Confirmation Order in this Court.

Its failure to do so is fatal under Second Circuit authority. That is so because in the Second Circuit, courts expect appellants to proceed with dispatch at every step of the process. *See Chateaugay II,* 10 F.3d at 954 (finding appeal not equitably moot in part because appellant "sought to stay the confirmation of the Plan in urgent applications before the bankruptcy court,

15

the district court and this Court. [Appellant] did not prevail on any of those applications, but that result certainly cannot be attributed to any lack of initiative."); *In re Metromedia Fiber Network, Inc.*, 416 F.3d 145 ("Having sought no stay of the bankruptcy court's order (and no expedited appeal), appellants bear the burden of [the] uncertainty [of what will happen if the plan is in any part altered]." (citing *Chateaugay I*, 988 F.2d at 326 ("The party who appeals without seeking to avail himself of that protection does so at his own risk.")); *Aetna Cas. & Sur. Co. v. LTV Steel Co.*, 94 F.3d 772, 776 (2d Cir.1996) (noting in dicta that we "presume that it will be inequitable or impractical to grant relief after substantial consummation," unless, among other things, "the entity seeking relief has diligently pursued a stay of execution of the plan *throughout the proceedings*") (emphasis added). FELRA's effort here falls far short of this standard.

In sum, the Court finds that FELRA is unable to satisfy any of the *Chateaugay II* factors. Accordingly, because the Court has found that the Plan has been substantially consummated, FELRA is unable to overcome the "strong presumption" that an appeal of an unstayed order is moot. *Freeman v. Journal Register Co.*, 2010 WL 768942, at *4.

### III. Conclusion

For the reasons set forth above, the FELRA's appeal of the Confirmation Order is DISMISSED as equitably moot. The Clerk of the Court is respectfully directed to docket this decision, terminate the motion, Doc. 5, and close the case.

It is SO ORDERED.

Dated: March 31, 2013
        White Plains, New York

                                                                   Edgardo Ramos, U.S.D.J.